PICKERING, J., dissenting:
There are three reasons I must dissent. First, the appellant waived the burden of proof issue by not raising it until it filed its reply brief in this court. Second, the district court did not rescind the sale or prevent delivery of the trustee's deed, the person charged with conducting the sale did because that person believed that it had conducted the sale in error-a determination the facts and the law support. And third, even accepting for purposes of argument that the owner had to prove pre-sale payment to win, NRS 47.250(13) presumes "[t]hat a letter duly directed and mailed was received in the regular course of the mail." The parties' stipulations and the evidence established that the owner mailed its cure check 7 days before the scheduled foreclosure sale and that a letter mailed from the main Las Vegas post office to a local address takes fewer than 7 days to arrive "in the regular course of the mail." Under NRS 47.200, this was evidence enough to establish timely payment or, at minimum, to make timely payment a question of fact for the trial court, not of law for this court, to decide.
I.
Appellant Resources Group, LLC was the plaintiff below. Its complaint asked the district court to do two things: (1) to compel the trustee who conducted the foreclosure sale, respondent Nevada Association Services (NAS), to deliver a deed to the commercial warehouse property in dispute (the property); and (2) to quiet title in its name and against respondent Hydr-O-Dynamic Corporation (HODC). HODC owned the property, which it acquired in 2009 for $2,250,000, free and clear. Since NAS rescinded the sale without delivering a trustee's deed to Resources Group, HODC was and remains the record titleholder of the property.
The first conclusion of law the district court stated was that, as the plaintiff seeking to quiet title in itself against the property's record titleholder, "Resources Group has the burden of proof to show title should be vested in its name." This is a correct statement of Nevada law:
In a quiet title action, the burden of proof rests with the plaintiff to prove good title in himself. Moreover, there is a presumption in favor of the record title holder.
Breliant v. Preferred Equities Corp. , 112 Nev. 663, 669, 918 P.2d 314, 318 (1996) (emphasis added) (citations omitted), abrogated *163 on other grounds by Delgado v. Am. Family Ins. Grp., 125 Nev. 564, 570, 217 P.3d 563, 567 (2009) ; accord W. Sunset 2050 Tr. v. Nationstar Mortg., LLC, 134 Nev. ----, ---- - ----, 420 P.3d 1032, 1034-35 (2018) (quoting Breliant ); 65 Am. Jur. 2d Quieting Title § 73 (2011) ("In a quiet title action, there is a presumption in favor of the record titleholder, and the evidence to overcome that presumption must be clear and convincing.") (footnotes omitted) (citing Breliant ).
Against this mainstream law, the majority puts the burden of proof on HODC, the defendant and record titleholder. It does so based on arguments and authority, including NRCP 8, that Resources Group never raised until it filed its reply brief in this court. Compare NRAP 28(a)(6) (requiring an appellant to include in its opening brief "a statement of the issues presented for review"), with Phillips v. Mercer , 94 Nev, 279, 283, 579 P.2d 174, 176 (1978) (holding that issues "raised for the first time in appellant's reply brief[ ] will not be considered on appeal"). The rule against considering an issue not raised until an appellant's reply promotes sound decision-making because it ensures that, before weighing in on an issue, this court has input from the district court, the parties, and sometimes, even, amicus curiae. Since the majority's decision depends on assigning HODC the burden of proof, since the law does not clearly assign this burden to HODC, and since Resources Group did not make the burden of proof argument on which the majority relies to decide this appeal until it filed its reply, I would leave the issue for another day and deem it waived.
II.
A foreclosure sale on an NRS Chapter 116 homeowners' association (HOA) lien is void if, before the sale, the owner or deed-of-trust beneficiary cures the default. Bank of Am., N.A. v. SFR Invs. Pool 1, LLC, 134 Nev. ----, ----, 427 P.3d 113, 121 (2018) ("A foreclosure sale on [an HOA] lien after valid tender satisfies that lien is void, as the lien is no longer in default.").[1] The equitable right to redeem by cure terminates when the foreclosure sale concludes and the person conducting the sale delivers a trustee's deed to a bona fide purchaser for value (BFP). Compare Restatement (Third) of Property: Mortgages § 6.4(a) (Am. Law Inst. 1997) (recognizing the equitable right to redeem property from a lien by performing the obligation secured by the lien terminates with foreclosure), with Nguyen v. Calhoun, 105 Cal.App.4th 428, 129 Cal.Rptr.2d 436, 449 (2003) (holding that payment that arrived by Federal Express three days after the foreclosure sale occurred and the trustee's deed was delivered came too late to avoid loss of the property). The high bidder does not acquire title-much less the right to a statutory trustee's deed-absent a valid foreclosure sale. Cf. Las Vegas Dev. Grp., LLC v. Blaha, 134 Nev. ----, ---- n.7, 416 P.3d 233, 237 n.7 (2018) (emphasizing that only "a valid trustee's foreclosure sale terminates [a record title holder's] legal and equitable interests in the property") (internal quotation omitted).
NRS 116.31166(1) (1993) describes the presumptions of validity that attach to a delivered trustee's deed. But those presumptions do not attach until the trustee (or in Chapter 116 parlance, "the person conducting the sale," see NRS 116.31164 ) executes and delivers the trustee's deed. See Moeller v. Lien, 25 Cal.App.4th 822, 30 Cal.Rptr.2d 777, 783-84 (1994). Because the statutory presumptions of validity do not attach "if there is a defect in the procedure which is discovered after the bid is accepted but prior to delivery of the trustee's deed, the trustee may abort a *164 sale to a bona fide purchaser, return the purchase price and restart the foreclosure process." Id. ; accord Biancalana v. T.D. Serv. Co., 56 Cal.4th 807, 156 Cal.Rptr.3d 437, 300 P.3d 518, 522 (2013) (holding that a trustee who discovers a material defect in the foreclosure sale process before delivering the deed may rescind the sale and restart the process; "the statutory foreclosure process aims to ensure that a properly conducted sale is final between the parties" but this "purpose is not served by enforcing the finality of a sale that was conducted improperly"); Lee v. HSBC Bank, USA, 121 Hawai'i 287, 218 P.3d 775, 776 (2009) (holding that "where a mortgagor cures its default prior to a foreclosure proceeding ... but an auction inadvertently goes forward, ... [no] valid agreement [is] created entitling the high bidder at the auction to lost profits"); Taylor v. Just , 138 Idaho 137, 59 P.3d 308, 310-11 (2002) (upholding the foreclosure trustee's authority to rescind the sale and refuse to deliver a deed without exposure to contract damages where the bank's email to the trustee advising it had promised the owner not to proceed with the sale went astray); Udall v. T.D. Escrow Servs., Inc., 159 Wash.2d 903, 154 P.3d 882, 887 (2007) (holding that a trustee may withhold a deed where there is a procedural irregularity that renders the sale void); 5 Miller & Starr, Cal. Real Est. § 13:250 (4th ed. 2018) ("[T]he trustee has the authority to rescind the sale upon discovery of an irregularity before the delivery of the deed. Prior to the delivery of the trustee's deed, there are no conclusive presumptions that the sale is valid."); 59A C.J.S. Mortgages § 819 (2009) ("Under statutory scheme, if there is a defect in the procedure which is discovered after the bid is accepted but prior to the delivery of the trustee's deed, the trustee may abort the sale to a bona fide purchaser, return the purchase price and restart the foreclosure process.").
Nevada law has long given courts "the power to grant equitable relief from a defective foreclosure sale when appropriate." Shadow Wood Homeowners Assoc., Inc. v. N.Y. Cmty. Bancorp., Inc., 132 Nev. 49, 57-59, 366 P.3d 1105, 1110-11 (2016) (citing Golden v. Tomiyasu, 79 Nev. 503, 514, 387 P.2d 989, 995 (1963), and Oller v. Sonoma Cty. Land Title Co., 137 Cal.App.2d 633, 290 P.2d 880, 882 (1955) ). Low price, alone, will not justify invalidating a properly conducted sale; there must also be a showing of irregularities affecting the sale. Nationstar Mortg., LLC v. Saticoy Bay LLC Series 2227 Shadow Canyon, 133 Nev. ----, ---- - ----, 405 P.3d 641, 647-48 (2017). But the greater the disparity between price and value, the less in the way of unfairness or irregularity need be shown. Golden, 79 Nev. at 515-16, 387 P.2d at 995 ("[I]t is universally recognized that inadequacy of price is a circumstance of greater or less weight to be considered in connection with other circumstances impeaching the fairness of the transaction as a cause of vacating it, and that, where the inadequacy is palpable and great, very slight additional evidence of unfairness or irregularity is sufficient to authorize the granting of the relief sought.") (quoting Odell v. Cox, 151 Cal. 70, 90 P. 194, 196 (1907) ), quoted with approval in Nationstar Mortg. , 133 Nev. at ----, 405 P.3d at 648.
While our cases authorize a court to set aside a foreclosure sale for invalidity-even after the trustee has delivered its deed-we have not had occasion to consider whether a trustee can rescind a sale and refuse to deliver a deed because the trustee discovers facts indicating the sale's invalidity. California law, on which Golden, Shadow Wood, and Nationstar all rely, draws on the courts' equitable authority to set aside a foreclosure sale in recognizing a trustee's authority to rescind a sale for procedural irregularity or unfairness, so long as the trustee does so before delivering the deed. Biancalana, 156 Cal.Rptr.3d 437, 300 P.3d at 522-23 (reciting that "gross inadequacy of price coupled with even slight unfairness or irregularity is a sufficient basis for setting the sale aside" and applying it to a trustee's decision to rescind a sale prior to delivering the deed); see Residential Capital LLC v. Cal-W. Reconveyance Corp., 108 Cal.App.4th 807, 134 Cal.Rptr.2d 162, 173 (2003) ("Only a properly conducted foreclosure sale, free of substantial defects in procedure, creates rights in the high bidder at the sale."). Allowing a trustee to rescind a defective or improperly conducted sale so long as the trustee acts before it issues the deed incentivizes *165 the trustee "to exercise diligence in promptly reviewing the sale and identifying any irregularity." Biancalana, 156 Cal.Rptr.3d 437, 300 P.3d at 527. While this "may create some uncertainty for bidders" and detract from the interest in finality, "if a procedural defect in the sale is detected before the trustee's deed is issued, the successful foreclosure sale bidder has not been seriously prejudiced." Id. , 156 Cal.Rptr.3d 437, 300 P.3d at 526 (internal quotation omitted).
Applying this law to the record facts, we should affirm, not reverse, the district court. NAS sent the notice of default in 2012 and the notice of sale in 2015. Although the notices were properly mailed, HODC did not learn about the foreclosure proceedings until February 6, 2015-7 days before the scheduled foreclosure sale-when an NAS agent delivered a copy of the notice of sale to HODC's principal, Juan Guzman. That same day, Guzman went inside the main U.S. Post Office on Sunset Road in Las Vegas and mailed NAS the $6554.09 check needed to cure its default. In Guzman's experience, mail sent from this Post Office to another local address normally takes a day or two to arrive. We know NAS received the check on or before the date of the sale because it stamped the check "received" on February 13, 2015, the date of the sale. (Although the majority suggests otherwise, the district court found it "possible" the check arrived before February 13, 2015.)
NAS scheduled and conducted the foreclosure sale at 10 a.m., despite that its mail normally arrived between 9:30 a.m. and 11:30 a.m., and despite not having in place protocols to establish the precise date and time a mailed check arrived. It is at this point that the procedural irregularities that led NAS to rescind the sale emerge: After discovering HODC's check and examining its records, NAS could not verify it had conducted a valid foreclosure sale. Given this uncertainty and the ambiguous February 13, 2015 "received" stamp on HODC's cure check, NAS declined to issue a trustee's deed and offered to return Resources Group's bid price payment, with interest. These are not disputed or inferred facts; the parties stipulated to them in district court. See July 6, 2016 Joint Pretrial Memorandum (stipulating that NAS believed "(22) the check for payment in full had crossed paths with the foreclosure sale and that NAS did not have enough time to process the check on February 13, 2015, link it with the foreclosure sale set that morning, and stop the sale"; that NAS believed "(25) the sale was made in error because of the crossing of the owner's payment in full and the sale"; and "(27) that [b]ecause NAS believed the sale was conducted in error, it has never released nor recorded a Foreclosure Deed for the subject property.").
The rule allowing a trustee to rescind a sale when material irregularities emerge before delivery of a deed is consistent with Golden, Shadow Wood, and Nationstar -and with the judgment the district court entered, which denied Resources Group's requests that it direct NAS to deliver the trustee's deed and quiet title in Resources Group and against HODC. But this case does not require the court to adopt Biancalana, Residential Capital, and Just. It can also be resolved under Golden, Shadow Wood , and Nationstar.
The record establishes a substantial disparity between value and bid price. HODC acquired the property in 2009 for $2,250,000 and owned it free and clear, except for the HOA's $6554.09 lien. The property's value had declined substantially by 2015. Even so, the $350,000 bid Resources Group made for the property represented less than a third of what the district court found it was worth. This price/value disparity, combined with NAS's inability to verify a valid sale (not to mention its determination that it had conducted the sale in error, see Joint Pretrial Memorandum ¶27, supra ) support the district court's judgment against Resources Group and in favor of NAS and HODC under existing Nevada law. As noted in my concurring and dissenting colleague's opinion, we would need to reverse and remand to resolve this case purely under Golden, Shadow Wood, and Nationstar, because the district court may have relied in exercising its equitable authority, on a statutory right of redemption that did not enter NRS Chapter 116 until after the sale in this case was held.
*166 III.
The majority holds, seemingly as a matter of law, that HODC failed to produce evidence from which the finder of fact could find its check arrived at NAS on or before the 10 a.m. February 13, 2015 sale date. This holding does not square with the record facts or with NRS 47.250(13) and NRS 47.200. As noted above, HODC mailed the check from the main U.S. Post Office in Las Vegas on February 6, 2015, to NAS's Las Vegas office. NAS received the check at least by February 13, 2015, when it stamped it received. Guzman testified that letters mailed locally from that post office usually take a day or two to arrive.
NRS 47.250(13) presumes that "a letter duly directed and mailed was received in the regular course of the mail." This presumption, combined with the date stamp and NAS's testimony that the check could have come even earlier than February 13, 2015, constitutes evidence of delivery to NAS on or after February 8, 2015 and before the 10 a.m. February 13, 2015 sale date and time. See Henderson v. Carbondale Coal & Coke Co., 140 U.S. 25, 37, 11 S.Ct. 691, 35 L.Ed. 332 (1891) (noting that the presumption that mail is received within a normal delivery time is "not a presumption of law but one of fact"). The "basic facts" thus established, NRS 47.200 applies. NRS 47.200 does not demand 100% certainty or proof beyond a reasonable doubt. It deals in terms of "reasonable minds" and "probability." Under NRS 47.200, it cannot be said that, as a matter of law, the check did not arrive on or before February 13, 2015 at 10 a.m. On the contrary, NRS 47.200 and NRS 47.250(13) mandate the opposite finding or, at minimum, a determination that the time of delivery is a question of fact for the district court to determine in the first instance.
I therefore respectfully dissent.

The Honorable Elissa F. Cadish and the Honorable Abbi Silver did not participate in the decision of this matter. The Honorable Michael L. Douglas, Senior Justice, was appointed by the court to participate in the decision of this matter.

The foreclosure proceedings in this case predated the effective date of the 2015 amendments to NRS Chapter 116, which created a statutory right of redemption and imposed time limits on pre-sale lien-default cures. See NRS 116.31166(1), (3) (2017). The parties stipulated that if HODC's check arrived at the Las Vegas offices of respondent Nevada Association Services (NAS) before NAS proceeded with the foreclosure auction on February 13, 2015, this would void the sale. This stipulation comports with section 6.12 of the governing CC & Rs, which state: "In the event the delinquent assessments ... are fully paid or otherwise satisfied prior to the completion of any sale held to foreclose the lien provided for in this Declaration, the Association shall record a further notice ... stating the satisfaction and releasing of such lien." Of note, as a commercial property, the warehouse would not be subject to NRS Chapter 116 except the CC & Rs incorporate NRS 116.3116.