**135 Nev., Advance Opinion 8**
IN THE SUPREME COURT OF THE STATE OF NEVADA

RESOURCES GROUP, LLC, AS
TRUSTEE OF THE EAST SUNSET
ROAD TRUST,
Appellant,
vs.
NEVADA ASSOCIATION SERVICES,
INC.; AND HYDR-O-DYNAMIC
CORPORATION, A REVOKED
NEVADA CORPORATION,
Respondents.

No. 71268





MAR 14 2019

Appeal from a district court judgment in an action to quiet title to real property. Eighth Judicial District Court, Clark County; Nancy Becker, Senior Judge.

*Reversed and remanded.*

Law Offices of Michael F. Bohn, Ltd., and Michael F. Bohn, Las Vegas,
for Appellant.

Goold Patterson and Jeffrey D. Patterson, Las Vegas,
for Respondent Hydr-O-Dynamic Corporation.

Christopher V. Yergensen, Las Vegas,
for Respondent Nevada Association Services, Inc.

BEFORE THE COURT EN BANC.[1]

*OPINION*

By the Court, HARDESTY, J.:

This case presents us with an opportunity to clarify whether a person conducting a sale under NRS Chapter 116, governing nonjudicial foreclosure sales by a unit-owners' association (UOA), has the discretion to refuse to issue a foreclosure deed to the highest bidder at a foreclosure sale after payment has been made, when it is later determined that the delinquency amount may have been paid by the property owner before the sale.[2] We first hold that each party in a quiet title action has the burden of demonstrating superior title in himself or herself. We further hold that once a bid is accepted and payment is made, the foreclosure sale is complete and title vests in the purchaser, and the person conducting the sale has no discretion to refuse to issue the foreclosure deed. Lastly, we reaffirm our prior holdings that the correct standard for determining whether to set aside a sale on equitable grounds is whether there has been some showing of fraud, unfairness, or oppression affecting the sale.

---

[1]The Honorable Elissa F. Cadish and the Honorable Abbi Silver did not participate in the decision of this matter. The Honorable Michael L. Douglas, Senior Justice, was appointed by the court to participate in the decision of this matter.

[2]The 2015 Legislature substantially revised NRS Chapter 116. *See Shadow Wood Homeowners Ass'n, Inc. v. N.Y. Cmty. Bancorp, Inc.*, 132 Nev. 49, 56 n.2, 366 P.3d 1105, 1109 n.2 (2016). The references in this opinion to NRS Chapter 116 statutes are to the version of the statutes in effect when the events in this case occurred, which was before the effective date of the 2015 amendments.

 

Here, the purchaser demonstrated superior title by showing that it paid the sales price following a valid foreclosure sale. The burden of demonstrating that the delinquency was cured presale, rendering the sale void, was on the party challenging the foreclosure, who failed to meet its burden. Because we also conclude that the district court correctly found that there was no showing that fraud, unfairness, or oppression affected the sale, we hold that title vested in the purchaser's name and that the district court abused its discretion by setting aside the sale.

*FACTS AND PROCEDURAL HISTORY*

Respondent Hydr-O-Dynamic Corporation (HODC) was the legal owner and titleholder of real property located at 571 East Sunset Road in Henderson (the Property). The Property was located within a common-interest community comprised of commercial buildings overseen by Sunpac, a UOA formed under NRS Chapter 116. HODC became delinquent on the periodic assessments it was required to pay to the UOA, and respondent Nevada Association Services, Inc. (NAS), as the UOA's foreclosure agent, complied with all statutory presale requirements for a nonjudicial foreclosure sale of the Property pursuant to NRS 116.3116, including mailing default and sale notices certified with return receipt requested to HODC. The foreclosure sale was scheduled to take place on February 13, 2015, at 10 a.m.

On February 6, 2015, HODC's president mailed a check for the full amount of the delinquency ($6,554.09) to NAS via regular mail. At 10 a.m. on February 13, NAS, unaware that HODC had mailed a delinquency payment, began its property auctions, which included the subject Property. The auctions concluded at approximately 10:30 a.m. Appellant Resources Group, LLC, was the successful bidder on the Property, paying $350,000 in cashier's checks immediately following the conclusion of the auctions. That

same day, at some point between 9:30 a.m. and 11 a.m., NAS received the check from HODC. NAS did not inform its general counsel that it had received the check until February 17, however, due to an intervening three-day weekend. NAS's general counsel then contacted Resources Group, explained the situation, and offered to return Resources Group's cashier's checks, along with interest for the five days that had elapsed since the sale, in exchange for canceling the sale of the Property. Resources Group declined the offer, stating that it wanted either $1 million or the Property. Resources Group's agent informed NAS that he saw the mailman arrive on February 13 as he was leaving NAS's offices following the foreclosure sale, which would have been about 10:30 a.m., and thus, by the time NAS could have processed the payment, the foreclosure sale would have been completed. Despite this claim, NAS declined to issue a foreclosure deed to Resources Group.

Resources Group then filed a complaint against NAS, the UOA,[3] and HODC regarding title to the Property. After an unsuccessful summary judgment motion, the parties proceeded to trial. Ultimately, the district court entered judgment against Resources Group, finding that although HODC was delinquent in paying its assessments and the UOA's lien was perfected, Resources Group failed to demonstrate that the check curing the delinquency had not arrived before the foreclosure sale. The court discounted the testimony regarding the mailman as the agent had no specific memory distinguishing that day from any other. The court therefore concluded that Resources Group failed to meet its burden of showing that title should vest in its name.

---

[3]Resource Group later voluntarily dismissed the UOA without prejudice pursuant to NRCP 41(a)(1)(i).

The district court also concluded that the equities weighed in favor of setting aside the sale, reasoning that nothing in this court's recent line of NRS Chapter 116 foreclosure opinions "limit[ed] the exercise of equity to only those instances where there is gross inadequacy of price and fraud, unfairness or oppression that accounts for [an] inadequacy of price," even though that is a more common ground for setting aside a sale than it being deemed void due to sale irregularities. In balancing the equities, the court found that Resources Group tendered payment for the Property not knowing of the possible arrival of HODC's check, such that Resources Group arguably held bona fide purchaser status, but that setting aside the sale would not result in any prejudice to Resources Group as it would only suffer a loss of interest. The court also found that HODC did nothing more than deposit its delinquency-curing check in regular mail without any follow-up that NAS had received the check, but that the statutory scheme evidenced a legislative intent to allow post-sale redemption and that HODC would be severely prejudiced if the sale was not set aside. Based on these facts, the court concluded that the equities weighed in favor of HODC and set the sale aside such that HODC retained title to the Property.

*DISCUSSION*

I.

Resources Group argues that completion of a foreclosure sale and tender of the bid amount vests title to the property in the bidder, that the burden then lies on HODC to show that the sale was invalid because it cured the delinquency, and that HODC failed to meet that burden. Thus, Resources Group asserts that title to the Property vested in its name when it delivered the cashier's checks upon conclusion of the foreclosure sale and that there is no basis to set the sale aside.

Conversely, HODC argues that title passes to a successful bidder only at the conclusion of a *valid* foreclosure sale and payment of the bid amount. On this foundation, HODC argues that if its payment of the delinquency was received prior to the sale, the sale was invalid, and Resources Group had the burden to show that the sale was valid by demonstrating that HODC's check arrived after the sale or otherwise failed to cure the delinquency.

A.

While the "burden of proof [in a quiet title action] rests with the plaintiff to prove good title in himself," *Breliant v. Preferred Equities Corp.*, 112 Nev. 663, 669, 918 P.2d 314, 318 (1996), *abrogated on other grounds by Delgado v. Am. Family Ins. Grp.*, 125 Nev. 564, 570, 217 P.3d 563, 567 (2009), "a plaintiff's right to relief [ultimately] . . . depends on superiority of title," *W. Sunset 2050 Tr. v. Nationstar Mortg., LLC*, 134 Nev., Adv. Op. 47, 420 P.3d 1032, 1034 (2018) (internal quotation marks omitted). And because "[a] plea to quiet title does not require any particular elements, . . . each party must plead and prove his or her own claim to the property in question." *Chapman v. Deutsche Bank Nat'l Tr. Co.*, 129 Nev. 314, 318, 302 P.3d 1103, 1106 (2013) (internal quotation marks omitted). Thus, we analyze the parties' respective claims to the Property.

B.

A foreclosure sale generally terminates a party's legal title to the property. *See Bldg. Energetix Corp. v. EHE, LP*, 129 Nev. 78, 86, 294 P.3d 1228, 1234 (2013); *Charmicor, Inc. v. Bradshaw Fin. Co.*, 92 Nev. 310, 313, 550 P.2d 413, 415 (1976). This general rule is subject to certain limited exceptions, such as where the sale is void. *See Energetix*, 129 Nev. at 86, 294 P.3d at 1234 (noting that a lack of substantial compliance with the

relevant statutes and a lack of proper notice are exceptions to the general rule); *see also Bank of Am., N.A. v. SFR Invs. Pool 1, LLC*, 134 Nev., Adv. Op. 72, 427 P.3d 113, 121, *as amended on denial of reh'g* (2018) (holding that a foreclosure sale on a lien is void where that lien has been satisfied prior to the sale "as the lien is no longer in default"); *Henke v. First S. Props., Inc.*, 586 S.W.2d 617, 619-20 (Tex. Civ. App. 1979) (concluding that the payment of past-due installments cured a loan's default such that the subsequent foreclosure on the property was void); 1 Grant S. Nelson, Dale A. Whitman, Ann M. Burkhart & R. Wilson Freyermuth, *Real Estate Finance Law* § 7:21 (6th ed. 2014) (noting that a trustee's sale is void where there is no authorization to foreclose, and that there is no authorization to foreclose when the loan is not in default). To complete a valid foreclosure sale for unpaid assessments in Nevada, a UOA must comply with the provisions set forth in NRS Chapter 116. Relevant to the present case, the UOA must mail and record a notice of delinquent assessment, NRS 116.31162(1)(a), "a notice of default and election to sell," NRS 116.31162(1)(b), and a notice of foreclosure sale, NRS 116.311635(1)(a).[4] Moreover, a foreclosure sale is complete and title vests in the purchaser once payment has been made by the highest bidder. *See Dazet v. Landry*, 21 Nev. 291, 295, 30 P. 1064, 1066 (1892), *overruled on other grounds by Golden v. Tomiyasu*, 79 Nev. 503, 514-15, 387 P.2d 989, 995 (1963). After a sale is completed and payment is made, NRS 116.31164(3)(a) states that "the person conducting the sale *shall* . . . [m]ake, execute and . . . deliver to the purchaser" a deed conveying the property's title to the purchaser. (Emphasis added.)

---

[4]The covenants, conditions, and restrictions (CC&Rs) governing the Property imposed the same requirements as those required by statute.

Here, the district court found that it was uncontested that the sale complied with the statutory requirements, and that Resources Group made payment of the full bid amount in cashier's checks immediately after the auction. The record further suggests that NAS accepted the checks and provided Resources Group with a receipt of funds and instructions. If this constitutes a valid sale, NRS 116.31164(3)(a) mandates that the person conducting the sale execute and deliver a deed of the Property to Resources Group.

## II.

HODC argues, however, that it has superior title to the Property—despite the sale being properly conducted and Resources Group tendering payment of its bid—because it cured its default prior to the sale. In considering HODC's argument, we must address whether HODC has the burden of demonstrating that its delinquency-curing check arrived before the foreclosure sale, or whether this would be part of Resources Group's burden to prove that it has superior title to the Property. We conclude that the burden must lie with HODC. Payment of a debt is an affirmative defense, which the party asserting has the burden of proving. *See* NRCP 8(c) (listing payment as an affirmative defense); *Schwartz v. Schwartz*, 95 Nev. 202, 206 n.2, 591 P.2d 1137, 1140 n.2 (1979) ("Since the averments of an affirmative defense are taken as denied or avoided, each element of the defense must be affirmatively proved. The burden of proof clearly rests with the defendant." (citations omitted)). At least one court to address the issue agrees. *See Nguyen v. Calhoun*, 129 Cal. Rptr. 2d 436, 446 (Ct. App. 2003) ("The trustor-mortgagor or the person who alleges that a debt has been paid has the burden of proving payment." (internal quotation marks omitted)). Concluding that HODC bears the burden of proof on this issue, we now

address whether it met that burden by proving that it paid the delinquency amount in full prior to the sale.[5]

Although HODC does not argue on appeal that it met its burden of proof in this regard because it alleges that the burden was on Resources Group, it is clear from the record that HODC could not meet its burden. The evidence showed that, in its normal course of business, the mail would typically be delivered to NAS between 9:30 a.m. and 11:30 a.m., and that NAS would open and date-stamp its mail on the same day that it was delivered. HODC's check was date-stamped on February 13, 2015, the date of the sale, but no witness could credibly remember when the mail arrived that day.[6] The district court stated, and we agree, that this evidence could only support a finding "that HODC's check arrived between 9:30 a.m. and

---

[5]Resources Group argues that HODC waived the issue of payment because it did not plead it in its responsive pleadings below. A party waives an affirmative defense where the "party fails to raise the affirmative defense in any pleadings or any other papers filed with the court, including its answer, pretrial statement, or post-trial brief." *City of Boulder City v. Boulder Excavating, Inc.*, 124 Nev. 749, 755 n.12, 191 P.3d 1175, 1179 n.12 (2008) (internal quotation marks omitted). Nevertheless, we have held "that an affirmative defense can be considered (if not pleaded) if fairness so dictates and prejudice will not follow." *Ivory Ranch, Inc. v. Quinn River Ranch, Inc.*, 101 Nev. 471, 473, 705 P.2d 673, 675 (1985). Here, fairness dictates that we consider HODC's arguments regarding payment, as those arguments are crucial for determining whether the sale was void. In addition, no prejudice would follow because "[o]ne who bids upon property at a foreclosure sale does so at his peril," *Henke*, 586 S.W.2d at 620, and thus, if a sale is void, a purchaser should not be entitled to reap a windfall.

[6]An agent of Resources Group testified he remembered seeing the mail being delivered after the foreclosure sale was completed, but the district court found that testimony not to be credible and we will not reassess witness credibility on appeal. *See Ellis v. Carucci*, 123 Nev. 145, 152, 161 P.3d 239, 244 (2007).

"11:30 a.m. on February 13, 2015." Because the foreclosure sale ended at 10:30 a.m., this finding does not demonstrate that HODC paid the delinquency before the foreclosure sale. Thus, HODC failed to meet its burden and has therefore failed to demonstrate good title in itself.

## III.

NRS 116.31164(3)(a) provides that, once payment has been made, the person that conducted "the sale shall . . . [m]ake, execute and . . . deliver to the purchaser . . . a deed . . . which conveys to the grantee all title" to the purchased property. The use of the word "shall" denotes a lack of discretion. *Markowitz v. Saxon Special Servicing*, 129 Nev. 660, 665, 310 P.3d 569, 572 (2013) ("The word 'shall' is generally regarded as mandatory."); *cf. In re Montierth*, 131 Nev. 543, 550, 354 P.3d 648, 652 (2015) ("A ministerial act is an act performed by an individual in a prescribed legal manner in accordance with the law, without regard to, or the exercise of, the judgment of the individual." (internal quotation marks omitted)); *see also In re Rugroden*, 481 B.R. 69, 78 (Bankr. N.D. Cal. 2012) ("When a statute clearly gives an official no choice but to act, then the act is ministerial."). NAS therefore lacked the discretion to refuse to deliver the deed based on information received after the sale was properly completed and after Resources Group tendered its bid. Having concluded that Resources Group has demonstrated good title and HODC failed to demonstrate it cured its default before the sale, we now address whether the sale should be set aside on equitable grounds.

*The district court erred by setting the sale aside on equitable grounds*

Resources Group argues that, under *Shadow Wood*, 132 Nev. 49, 366 P.3d 1105, HODC must demonstrate that the sales price was grossly inadequate and that there was fraud, unfairness, or oppression that resulted in the low sales price in order for the foreclosure sale to be set aside

Supreme Court
OF
Nevada

(O) 1947A

on equitable grounds. Resources Group further argues that HODC is not entitled to equitable relief under *Shadow Wood* because the sale was conducted properly, lawfully, and fairly; because the sales price was not grossly inadequate; and because, even if the sales price was grossly inadequate, HODC failed to show that there was fraud, unfairness, or oppression that brought about that low price.[7]

Conversely, HODC contends that *Shadow Wood* should be read broadly to recognize a court's equitable power to set aside a foreclosure sale based on the entirety of the circumstances. HODC argues that the use of the court's equitable powers are warranted under the circumstances presented by this case because the delinquency-curing payment was made on the same day as the foreclosure sale.[8]

---

[7]Resources Group also argues that HODC had no right to redemption under the CC&Rs or statutory law because the sale was conducted properly, and the UOA CC&Rs provide that a properly conducted sale vests title in the purchaser without the unit owner's equity or redemption. In *Shadow Wood*, however, this court held that "[h]istory and basic rules of statutory interpretation confirm our view that courts retain the power to grant equitable relief from a defective foreclosure sale when appropriate *despite NRS 116.31166*." 132 Nev. at 57, 366 P.3d at 1110-11 (emphasis added). Courts can also provide equitable relief despite the language in the CC&Rs. *See McKnight Family, LLP v. Adept Mgmt. Servs., Inc.*, 129 Nev. 610, 615, 310 P.3d 555, 558 (2013) (recognizing the contractual nature of CC&Rs); *Wainwright v. Dunseath*, 46 Nev. 361, 366, 211 P. 1104, 1106 (1923) (holding that "courts of equity have the power to order the reformation of deeds [or] contracts").

[8]HODC also argues that it should be granted equitable relief because Resources Group failed to demonstrate it had good title. Having already concluded that Resources Group demonstrated good title in itself, we do not address this argument further.

 

A district court's decision to set aside a foreclosure sale on equitable grounds is subject to an abuse of discretion standard of review. *See Arsali v. Chase Home Fin. LLC*, 121 So. 3d 511, 519 (Fla. 2013) ("Trial courts' judgments pertaining to set asides of judicial foreclosure sales are now, as they always have been, subject to review by way of an abuse of discretion standard."). The party seeking to set aside the sale on equitable grounds bears the burden to "produce[ ] evidence showing that the sale was affected by fraud, unfairness, or oppression that would justify setting aside the sale." *Nationstar Mortg., LLC v. Saticoy Bay LLC Series 2227 Shadow Canyon*, 133 Nev., Adv. Op. 91, 405 P.3d 641, 643 (2017) (internal quotation marks omitted).

In *Shadow Wood* we held that "demonstrating that an association sold a property at its foreclosure sale for an inadequate price is not enough to set aside that sale [on equitable grounds]; there must also be a showing of fraud, unfairness, or oppression." 132 Nev. at 60, 366 P.3d at 1112. *Shadow Wood* also observed, however, that courts sitting in equity are required to analyze the totality of the circumstances when determining whether to set aside an HOA foreclosure sale on equitable grounds. *See id.* at 63, 366 P.3d at 1114 ("When sitting in equity, . . . courts must consider the entirety of the circumstances that bear upon the equities."). HODC interprets "totality of the circumstances" to mean that this court is to look broadly at all of the circumstances surrounding the sale and the parties in determining whether to set aside the sale and not just focus on whether there was a low sales price that was brought about by fraud, oppression, or unfairness.

As we subsequently clarified in *Nationstar*, this totality-of-the-circumstances analysis is tied to the traditional rule for determining

SUPREME COURT
OF
NEVADA

(O) 1947A

whether to set aside a sale on equitable grounds. 133 Nev., Adv. Op. 91, 405 P.3d at 648-49 ("[I]f the district court closely scrutinizes the circumstances of the sale and finds no evidence that the sale was affected by fraud, unfairness, or oppression, then the sale cannot be set aside, regardless of the inadequacy of price."). That is, if the totality of the circumstances demonstrates that *the sale itself* was affected by "fraud, unfairness, or oppression," then a court may set the sale aside. This has been the rule in Nevada since 1963. *See Golden*, 79 Nev. at 515, 387 P.2d at 995 ("[I]t is universally recognized that inadequacy of price is a circumstance of greater or less weight to be considered in connection with other circumstances impeaching *the fairness of the transaction* as a cause of vacating it . . . ." (emphasis added) (quoting *Odell v. Cox*, 90 P. 194, 196 (Cal. 1907))).

Here, the alleged equities in favor of setting aside the sale include those expressly stated by the district court: (1) "it was not unreasonable to assume that a check deposited in the main Las Vegas post office would be delivered within seven days to another Las Vegas address"; (2) Resources Group was not unduly prejudiced, as the only prejudice was a loss of interest on the money spent on the bid, "which could have been mitigated"; (3) HODC would suffer "extreme prejudice" if the sale were not set aside; and (4) "the Legislature intended to allow for the payment of community liens post sale by right of redemption."[9] In addition, the record suggests that there are possibly several other equities in favor of setting

---

[9]As noted earlier, the 2015 Legislature made substantial changes to NRS Chapter 116. As the revised version of NRS 116.3116 did not apply to the present case, and the 2014 version of the statute unambiguously did not allow for a right of redemption, the district court erred by gleaning an intent by the Legislature to provide for a post-sale right of redemption.

SUPREME COURT
OF
NEVADA

(O) 1947A

13

aside the sale. First, the district court found that, although unlikely, the check could have arrived earlier than February 13, 2015. Second, HODC's president testified that he was a small-business man and lacked the sophistication to know that he should follow up on his delinquency payment. Third, HODC did not have the keys to the mailbox for its property until late 2014, so it was unaware of any prior delinquency notices. Indeed, the first time that HODC allegedly received any notice of the delinquency or prior notices was when HODC's president was personally served with the notice of foreclosure in the parking lot of the Property on February 6, 2015.

The district court and HODC, however, fail to demonstrate that any of these equities constitute "fraud, unfairness, or oppression" that affected the sales price. Indeed, the district court acknowledged that the bid price was not inadequate and that there was no "evidence that the price was infected with unfairness, fraud or oppression." Even if we broadly interpreted the "unfairness" factor to include these additional equities, we conclude that the equities would still weigh against HODC. HODC asserted that it did not have access to its mail to receive the initial delinquent assessment notices regarding the Property,[10] but that was solely within HODC's control.[11] Additionally, with regard to the check, HODC only

---

[10]HODC does not dispute the sufficiency of the notices.

[11]As HODC received, at least, the notice of foreclosure sale, it was aware that it needed to cure the deficiency *before* the date of the foreclosure sale as the notice provided as follows:

> WARNING! A SALE OF YOUR PROPERTY IS IMMINENT! UNLESS YOU PAY THE AMOUNT SPECIFIED IN THIS NOTICE *BEFORE THE SALE DATE*, YOU COULD LOSE YOUR HOME, EVEN IF THE AMOUNT IS IN DISPUTE.

mailed it in the regular course of mail, one week before the sale. At trial, HODC's president conceded that he failed to pursue other options, such as overnight delivery or certified mail. HODC's president also acknowledged that he could have delivered the check in person or called NAS to ensure that the check had arrived, but failed to do so. Based on these facts, we agree with the district court that "HODC did nothing [beyond putting the check in the mail] to ensure the check had arrived and there were certainly a number of alternatives."

The record reflects that HODC's lack of diligence—not "fraud, unfairness, or oppression"—is what led to the foreclosure sale. *See Moeller v. Lien*, 30 Cal. Rptr. 2d 777, 785 (Ct. App. 1994) (holding that a party was not entitled to equity in a foreclosure sale where the party's "delays, negligence and inattention were the sole cause of the sale"); *Chase Fin. Servs., LLC. v. Edelsberg*, 129 So. 3d 1139, 1142 (Fla. Dist. Ct. App. 2013) (holding that a party's lack of diligence is insufficient for setting aside a foreclosure sale on equitable grounds). Accordingly, we conclude that the district court abused its discretion by setting aside the sale on equitable grounds.

## CONCLUSION

We hold that Resources Group demonstrated superior title because it made payment of the bid amount upon conclusion of a foreclosure sale that complied with the statutory requirements, and HODC failed to

(Emphasis added.) *See* NRS 116.311635(3)(b). The notice also provided the date of the sale; thus, HODC was on notice that the Property could be lost if the amount specified was not paid by February 12, 2015, not the date of the foreclosure sale.

demonstrate that the sale was void due to the deficiency being cured. Thus, NAS did not have the discretion to refuse to issue the foreclosure deed. We further hold that HODC is not entitled to equitable relief, as it has failed to demonstrate "that the sale was affected by fraud, unfairness, or oppression." *Nationstar*, 133 Nev., Adv. Op. 91, 405 P.3d at 643 (internal quotation marks omitted). Accordingly, we reverse the judgment of the district court and conclude that Resources Group is entitled to the foreclosure deed upon remand.

_____, J.
Hardesty

We concur:

_____, J.
Parraguirre

_____, J.
Stiglich

_____, Sr. J.
Douglas

SUPREME COURT
OF
NEVAOA

(O) 1947A

GIBBONS, C.J., concurring in part and dissenting in part:

Although I concur with the majority that the burden of proof of payment of the debit is upon HODC, I would remand this case for a new trial. The district court incorrectly concluded that HODC had a right of redemption by payment of this lien post sale. Regardless, further findings of fact must be done so that the district court can determine if HODC can meet its burden of proof.

_____, C.J.
Gibbons

SUPREME COURT
OF
NEVADA

(O) 1947A

PICKERING, J., dissenting:

There are three reasons I must dissent. First, the appellant waived the burden of proof issue by not raising it until it filed its reply brief in this court. Second, the district court did not rescind the sale or prevent delivery of the trustee's deed, the person charged with conducting the sale did because that person believed that it had conducted the sale in error—a determination the facts and the law support. And third, even accepting for purposes of argument that the owner had to prove pre-sale payment to win, NRS 47.250(13) presumes "[t]hat a letter duly directed and mailed was received in the regular course of the mail." The parties' stipulations and the evidence established that the owner mailed its cure check 7 days before the scheduled foreclosure sale and that a letter mailed from the main Las Vegas post office to a local address takes fewer than 7 days to arrive "in the regular course of the mail." Under NRS 47.200, this was evidence enough to establish timely payment or, at minimum, to make timely payment a question of fact for the trial court, not of law for this court, to decide.

I.

Appellant Resources Group, LLC was the plaintiff below. Its complaint asked the district court to do two things: (1) to compel the trustee who conducted the foreclosure sale, respondent Nevada Association Services (NAS), to deliver a deed to the commercial warehouse property in dispute (the property); and (2) to quiet title in its name and against respondent Hydr-O-Dynamic Corporation (HODC). HODC owned the property, which it acquired in 2009 for $2,250,000, free and clear. Since NAS rescinded the sale without delivering a trustee's deed to Resources Group, HODC was and remains the record titleholder of the property.

The first conclusion of law the district court stated was that, as the plaintiff seeking to quiet title in itself against the property's record titleholder, "Resources Group has the burden of proof to show title should be vested in its name." This is a correct statement of Nevada law:

> In a quiet title action, the burden of proof rests with the plaintiff to prove good title in himself. *Moreover, there is a presumption in favor of the record titleholder.*

*Breliant v. Preferred Equities Corp.*, 112 Nev. 663, 669, 918 P.2d 314, 318 (1996) (emphasis added) (citations omitted), *abrogated on other grounds by Delgado v. Am. Family Ins. Grp.*, 125 Nev. 564, 570, 217 P.3d 563, 567 (2009); *accord W. Sunset 2050 Tr. v. Nationstar Mortg., LLC*, 134 Nev., Adv. Op. 47, 420 P.3d 1032, 1034-35 (2018) (quoting *Breliant*); 65 Am. Jur. 2d *Quieting Title* § 73 (2011) ("In a quiet title action, there is a presumption in favor of the record titleholder, and the evidence to overcome that presumption must be clear and convincing.") (footnotes omitted) (citing *Breliant*).

Against this mainstream law, the majority puts the burden of proof on HODC, the defendant and record titleholder. It does so based on arguments and authority, including NRCP 8, that Resources Group never raised until it filed its reply brief in this court. *Compare* NRAP 28(a)(6) (requiring an appellant to include in its opening brief "a statement of the issues presented for review"), *with Phillips v. Mercer*, 94 Nev. 279, 283, 579 P.2d 174, 176 (1978) (holding that issues "raised for the first time in appellant's reply brief[] will not be considered on appeal"). The rule against considering an issue not raised until an appellant's reply promotes sound decision-making because it ensures that, before weighing in on an issue, this court has input from the district court, the parties, and sometimes, even, amicus curiae. Since the majority's decision depends on assigning

Supreme Court
OF
Nevada

(0) 1947A

2

HODC the burden of proof, since the law does not clearly assign this burden to HODC, and since Resources Group did not make the burden of proof argument on which the majority relies to decide this appeal until it filed its reply, I would leave the issue for another day and deem it waived.

## II.

A foreclosure sale on an NRS Chapter 116 homeowners' association (HOA) lien is void if, before the sale, the owner or deed-of-trust beneficiary cures the default. *Bank of Am., N.A. v. SFR Invs. Pool 1, LLC*, 134 Nev., Adv. Op. 72, 427 P.3d 113, 121 (2018) ("A foreclosure sale on [an HOA] lien after valid tender satisfies that lien is void, as the lien is no longer in default.").[1] The equitable right to redeem by cure terminates when the foreclosure sale concludes and the person conducting the sale delivers a trustee's deed to a bona fide purchaser for value (BFP). *Compare* Restatement (Third) of Property: Mortgages § 6.4(a) (Am. Law Inst. 1997) (recognizing the equitable right to redeem property from a lien by performing the obligation secured by the lien terminates with foreclosure), *with Nguyen v. Calhoun*, 129 Cal. Rptr. 2d 436, 449 (Ct. App. 2003) (holding

---

[1]The foreclosure proceedings in this case predated the effective date of the 2015 amendments to NRS Chapter 116, which created a statutory right of redemption and imposed time limits on pre-sale lien-default cures. *See* NRS 116.31166(1), (3) (2017). The parties stipulated that if HODC's check arrived at the Las Vegas offices of respondent Nevada Association Services (NAS) before NAS proceeded with the foreclosure auction on February 13, 2015, this would void the sale. This stipulation comports with section 6.12 of the governing CC&Rs, which state: "In the event the delinquent assessments . . . are fully paid or otherwise satisfied prior to the completion of any sale held to foreclose the lien provided for in this Declaration, the Association shall record a further notice . . . stating the satisfaction and releasing of such lien." Of note, as a commercial property, the warehouse would not be subject to NRS Chapter 116 except the CC&Rs incorporate NRS 116.3116.

that payment that arrived by Federal Express three days after the foreclosure sale occurred and the trustee's deed was delivered came too late to avoid loss of the property). The high bidder does not acquire title—much less the right to a statutory trustee's deed—absent a *valid* foreclosure sale. *Cf. Las Vegas Dev. Grp., LLC v. Blaha*, 134 Nev., Adv. Op. 33, 416 P.3d 233, 237 n.7 (2018) (emphasizing that only "a *valid* trustee's foreclosure sale terminates [a record title holder's] legal and equitable interests in the property") (internal quotation omitted).

NRS 116.31166(1) (1993) describes the presumptions of validity that attach to a delivered trustee's deed. But those presumptions do not attach until the trustee (or in Chapter 116 parlance, "the person conducting the sale," *see* NRS 116.31164) executes and delivers the trustee's deed. *See Moeller v. Lien*, 30 Cal. Rptr. 2d 777, 783-84 (Ct. App. 1994). Because the statutory presumptions of validity do not attach "if there is a defect in the procedure which is discovered after the bid is accepted but prior to delivery of the trustee's deed, the trustee may abort a sale to a bona fide purchaser, return the purchase price and restart the foreclosure process." *Id.*; *accord Biancalana v. T.D. Serv. Co.*, 300 P.3d 518, 522 (Cal. 2013) (holding that a trustee who discovers a material defect in the foreclosure sale process before delivering the deed may rescind the sale and restart the process; "the statutory foreclosure process aims to ensure that a properly conducted sale is final between the parties" but this "purpose is not served by enforcing the finality of a sale that was conducted improperly"); *Lee v. HSBC Bank, USA*, 218 P.3d 775, 776 (Haw. 2009) (holding that "where a mortgagor cures its default prior to a foreclosure proceeding . . . but an auction inadvertently goes forward, . . . [no] valid agreement [is] created entitling the high bidder at the auction to lost profits"); *Taylor v. Just*, 59 P.3d 308, 310-11 (Idaho

2002) (upholding the foreclosure trustee's authority to rescind the sale and refuse to deliver a deed without exposure to contract damages where the bank's email to the trustee advising it had promised the owner not to proceed with the sale went astray); *Udall v. T.D. Escrow Servs., Inc.*, 154 P.3d 882, 887 (Wash. 2007) (holding that a trustee may withhold a deed where there is a procedural irregularity that renders the sale void); 5 Miller & Starr, Cal. Real Est. § 13:250 (4th ed. 2018) ("[T]he trustee has the authority to rescind the sale upon discovery of an irregularity before the delivery of the deed. Prior to the delivery of the trustee's deed, there are no conclusive presumptions that the sale is valid."); 59A C.J.S. *Mortgages* § 819 (2009) ("Under statutory scheme, if there is a defect in the procedure which is discovered after the bid is accepted but prior to the delivery of the trustee's deed, the trustee may abort the sale to a bona fide purchaser, return the purchase price and restart the foreclosure process.").

Nevada law has long given courts "the power to grant equitable relief from a defective foreclosure sale when appropriate." *Shadow Wood Homeowners Assoc., Inc. v. N.Y. Cmty. Bancorp., Inc.*, 132 Nev. 49, 57-59, 366 P.3d 1105, 1110-11 (2016) (citing *Golden v. Tomiyasu*, 79 Nev. 503, 514, 387 P.2d 989, 995 (1963), and *Oller v. Sonoma Cty. Land Title Co.*, 290 P.2d 880, 882 (Cal. Ct. App. 1955)). Low price, alone, will not justify invalidating a properly conducted sale; there must also be a showing of irregularities affecting the sale. *Nationstar Mortg., LLC v. Saticoy Bay LLC Series 2227 Shadow Canyon*, 133 Nev., Adv. Op. 91, 405 P.3d 641, 647-48 (2017). But the greater the disparity between price and value, the less in the way of unfairness or irregularity need be shown. *Golden*, 79 Nev. at 515-16, 387 P.2d at 995 ("[I]t is universally recognized that inadequacy of price is a circumstance of greater or less weight to be considered in connection with

SUPREME COURT
OF
NEVADA

(O) 1947A

5

other circumstances impeaching the fairness of the transaction as a cause of vacating it, and that, where the inadequacy is palpable and great, very slight additional evidence of unfairness or irregularity is sufficient to authorize the granting of the relief sought.") (quoting *Odell v. Cox*, 90 P. 194, 196 (Cal. 1907)), *quoted with approval in Nationstar Mortg.*, 133 Nev., Adv. Op. 91, 405 P.3d at 648.

While our cases authorize a *court* to set aside a foreclosure sale for invalidity—even after the trustee has delivered its deed—we have not had occasion to consider whether a *trustee* can rescind a sale and refuse to deliver a deed because the trustee discovers facts indicating the sale's invalidity. California law, on which *Golden*, *Shadow Wood*, and *Nationstar* all rely, draws on the courts' equitable authority to set aside a foreclosure sale in recognizing a trustee's authority to rescind a sale for procedural irregularity or unfairness, so long as the trustee does so before delivering the deed. *Biancalana*, 300 P.3d at 522-23 (reciting that "gross inadequacy of price coupled with even slight unfairness or irregularity is a sufficient basis for setting the sale aside" and applying it to a trustee's decision to rescind a sale prior to delivering the deed); *see Residential Capital LLC v. Cal-W. Reconveyance Corp.*, 134 Cal. Rptr. 2d 162, 173 (Ct. App. 2003) ("Only a properly conducted foreclosure sale, free of substantial defects in procedure, creates rights in the high bidder at the sale."). Allowing a trustee to rescind a defective or improperly conducted sale so long as the trustee acts before it issues the deed incentivizes the trustee "to exercise diligence in promptly reviewing the sale and identifying any irregularity." *Biancalana*, 300 P.3d at 527. While this "may create some uncertainty for bidders" and detract from the interest in finality, "if a procedural defect in the sale is detected before the trustee's deed is issued, the successful

SUPREME COURT
OF
NEVADA

(O) 1947A

foreclosure sale bidder has not been seriously prejudiced." *Id.* at 526 (internal quotation omitted).

Applying this law to the record facts, we should affirm, not reverse, the district court. NAS sent the notice of default in 2012 and the notice of sale in 2015. Although the notices were properly mailed, HODC did not learn about the foreclosure proceedings until February 6, 2015—7 days before the scheduled foreclosure sale—when an NAS agent delivered a copy of the notice of sale to HODC's principal, Juan Guzman. That same day, Guzman went inside the main U.S. Post Office on Sunset Road in Las Vegas and mailed NAS the $6554.09 check needed to cure its default. In Guzman's experience, mail sent from this Post Office to another local address normally takes a day or two to arrive. We know NAS received the check on or before the date of the sale because it stamped the check "received" on February 13, 2015, the date of the sale. (Although the majority suggests otherwise, the district court found it "possible" the check arrived *before* February 13, 2015.)

NAS scheduled and conducted the foreclosure sale at 10 a.m., despite that its mail normally arrived between 9:30 a.m. and 11:30 a.m., and despite not having in place protocols to establish the precise date and time a mailed check arrived. It is at this point that the procedural irregularities that led NAS to rescind the sale emerge: After discovering HODC's check and examining its records, NAS could not verify it had conducted a *valid* foreclosure sale. Given this uncertainty and the ambiguous February 13, 2015 "received" stamp on HODC's cure check, NAS declined to issue a trustee's deed and offered to return Resources Group's bid price payment, with interest. These are not disputed or inferred facts; the parties *stipulated* to them in district court. *See* July 6, 2016 Joint

Supreme Court
OF
Nevada

(O) 1947A

7

Pretrial Memorandum (*stipulating* that NAS believed "(22) the check for payment in full had crossed paths with the foreclosure sale and that NAS did not have enough time to process the check on February 13, 2015, link it with the foreclosure sale set that morning, and stop the sale"; that NAS believed "(25) the sale was made in error because of the crossing of the owner's payment in full and the sale"; and "(27) that [b]ecause NAS believed the sale was conducted in error, it has never released nor recorded a Foreclosure Deed for the subject property.").

The rule allowing a trustee to rescind a sale when material irregularities emerge before delivery of a deed is consistent with *Golden*, *Shadow Wood*, and *Nationstar*—and with the judgment the district court entered, which denied Resources Group's requests that it direct NAS to deliver the trustee's deed and quiet title in Resources Group and against HODC. But this case does not require the court to adopt *Biancalana*, *Residential Capital*, and *Just*. It can also be resolved under *Golden*, *Shadow Wood*, and *Nationstar*.

The record establishes a substantial disparity between value and bid price. HODC acquired the property in 2009 for $2,250,000 and owned it free and clear, except for the HOA's $6554.09 lien. The property's value had declined substantially by 2015. Even so, the $350,000 bid Resources Group made for the property represented less than a third of what the district court found it was worth. This price/value disparity, combined with NAS's inability to verify a valid sale (not to mention its determination that it had conducted the sale in error, see Joint Pretrial Memorandum ¶27, *supra*) support the district court's judgment against Resources Group and in favor of NAS and HODC under existing Nevada law. As noted in my concurring and dissenting colleague's opinion, we

would need to reverse and remand to resolve this case purely under *Golden, Shadow Wood,* and *Nationstar,* because the district court may have relied in exercising its equitable authority, on a statutory right of redemption that did not enter NRS Chapter 116 until after the sale in this case was held.

III.

The majority holds, seemingly as a matter of law, that HODC failed to produce evidence from which the finder of fact could find its check arrived at NAS on or before the 10 a.m. February 13, 2015 sale date. This holding does not square with the record facts or with NRS 47.250(13) and NRS 47.200. As noted above, HODC mailed the check from the main U.S. Post Office in Las Vegas on February 6, 2015, to NAS's Las Vegas office. NAS received the check at least by February 13, 2015, when it stamped it received. Guzman testified that letters mailed locally from that post office usually take a day or two to arrive.

NRS 47.250(13) presumes that "a letter duly directed and mailed was received in the regular course of the mail." This presumption, combined with the date stamp and NAS's testimony that the check could have come even earlier than February 13, 2015, constitutes evidence of delivery to NAS on or after February 8, 2015 and before the 10 a.m. February 13, 2015 sale date and time. *See Henderson v. Carbondale Coal & Coke Co.,* 140 U.S. 25, 37 (1891) (noting that the presumption that mail is received within a normal delivery time is "not a presumption of law but one of fact"). The "basic facts" thus established, NRS 47.200 applies. NRS 47.200 does not demand 100% certainty or proof beyond a reasonable doubt. It deals in terms of "reasonable minds" and "probability." Under NRS 47.200, it cannot be said that, as a matter of law, the check did not arrive

 

on or before February 13, 2015 at 10 a.m.  On the contrary, NRS 47.200 and NRS 47.250(13) mandate the opposite finding or, at minimum, a determination that the time of delivery is a question of fact for the district court to determine in the first instance.

I therefore respectfully dissent.

_____, J.
Pickering

SUPREME COURT
OF
NEVADA

(O) 1947A

10